IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Wayne Sims, | ) | C.A. No. 04-23259-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | OPINION AND ORDER GRANTING |
| | ) | MOTION FOR SUMMARY JUDGMENT |
| Allstate Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on Defendant's motion for judgment on the pleadings, to dismiss, or for summary judgment. Specifically, Defendant, Allstate Insurance Company ("Allstate"), asserts that it is entitled to summary judgment on all claims asserted by Plaintiff, Wayne Sims ("Sims"). Those claims arise out of the agent-insurer relationship between Sims and Allstate and consist of claims for: (1) breach of contract; (2) breach of duty of good faith and fair dealing; (3) breach of fiduciary duty; and (4) negligence. For the reasons set forth below, the motion to dismiss is granted as to the second claim and summary judgment is granted as to the remaining claims.

**STANDARDS**

**Motion to Dismiss.** A motion to dismiss should be granted only when it appears that plaintiff can prove no set of facts in support of a claim that would entitle plaintiff to relief on that claim. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In considering a motion to dismiss, the court must view the complaint in the light most favorable to plaintiff and resolve every doubt in plaintiff's favor. The plaintiff's allegations are to be taken as true for the purpose of ruling upon the motion. *Jenkins v. McKeithen*, 395 U.S. 411, 421-22 (1969). In addition, any inference reasonably drawn

from the complaint must be considered together with plaintiff's allegations of fact. *Murray v. City of Milford,* 380 F.2d 468, 470 (2d Cir. 1967). However, the court may not consider conclusions of law or unwarranted deductions of fact. *Mylan Laboratories, Inc. v. Akzo*, *N.V.*, 770 F. Supp. 1053, 1059 (D.Md. 1991).

**Summary Judgment.** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

2

## STATEMENT OF FACTS

**Contractual Relationship.** Taken in the light most favorable to Sims, the facts are as follows. Sims and Allstate entered into an Exclusive Agency Agreement ("Agreement") on or about October 1, 2000. Under the Agreement, Sims was authorized to receive and accept insurance applications on behalf of Allstate and to sell certain other products which Allstate offered. The Agreement incorporated certain other documents including an Exclusive Agency Independent Contractor Manual ("EA Manual") and the Allstate Agency Standards ("Agency Standards"). The EA Manual included a statement that Allstate was "committed to assisting you in being successful and in generating revenue to grow your business and meet your income goals." EA Manual at 12 (quoted in Plaintiff's Memorandum in Opposition, Dkt No. 24 at 3). This statement appears under the major heading "Agency Evaluation" and follows a list of "key areas that are currently considered in evaluating [an] agency's results." EA Manual at 11. The above-quoted statement of Allstate's commitment to its agents is immediately followed by the following statement:

> We are also committed to meeting Allstate's business objectives. Consequently, if your agency is not meeting one or more of the Company business objectives, you will be expected to address the deficiencies noted in the Agency Status Review. *If you request assistance in improving your agency's business results, we will recommend processes our experience has shown to be successful, that you may want to consider implementing in your agency.*

EA Manual at 12 (emphasis added).

**EA/EFS Partnership Program.** Sometime after the Agreement was entered, Allstate implemented an Exclusive Agent/Exclusive Financial Specialists program. This program is addressed in an EA/EFS Partnership Development Guide ("EA/EFS Guide"). The program was intended to provide a "mutually beneficial relationship" between Exclusive Agents (such as Sims)

and Exclusive Financial Specialists ("EFS"). EA/EFS Guide at 3. This mutual benefit was expected to result from cross-selling which would, presumably, lead to increased overall revenue and economic success for both the EA and EFS. EA/EFS Guide at 4.

The decision to form a partnership required that "both parties [be] interested in establishing an EA/EFS partnership" which, in turn, required various commitments on both sides. *Id.* at 8-9. This was because both EAs and EFSs were independent contractors. *See* Lowe Dep. at 33. *See also* Medlock Dep. at 13 ("As far as them working together, it was basically between the EA and the EFS."). Allstate did, however, have some ability to at least encourage, if not to assign or appoint, EFSs to work with agents, although Allstate's role was primarily to "help establish those relationships." Medlock Dep. at 16. *See also* Lowe Dep. at 33 & 93 ("You make the introduction . . . they see if their personalities match, see if the EA is willing ot take on the additional expense that's associated with it, see if they're willing to commit to a certain number of referrals on a regular basis, see if they have the processes in place to make it happen and then, you . . . just kind of give it a shot and see if it works. And if it does, it does; that's great. If it doesn't, you know, you try again.").[1]

During the period at issue in this litigation, Sims possessed the basic qualifications to partner with an EFS. *See* Medlock Dep. at 35. On one or more occasions, Sims requested that Allstate staff his office with an EFS. Medlock Dep. at 31-32 & 34. While Allstate did not provide Sims with an in-house EFS, it did make several attempts to help him partner with an EFS. Medlock Dep. at 15. Those relationships did not, however, work out. At least in the view of Allstate, based on the reports

---

[1] The evidence relating to the EFS program and Sims's experience with it comes largely from Allstate's witnesses. Sims has not, however, presented any contrary evidence.

4

of the EFSs involved,[2] this was because Sims failed to provide many leads and those provided were not quality leads, only names. Medlock Dep. at 25-26 (noting that one EFS ceased working with Sims because Sims "had not provided very many referrals" and because the leads provided "were just leads; . . . just names. And we had been asking for introductions, transfer of influence so that . . . we had a better chance of sitting down in front of the client"); Uschelbec Dep. at 17 (stating that one EFS asked to be reassigned from Sims to another EA because he "wasn't getting consistent leads and wasn't getting the support from Mr. Sims and had expressed some frustration . . . about the lack of support") & 18 (noting that Sims was not then assigned another EFS to work with because "he had previously worked with the available EFSs . . . . And for one reason or another, those relationships never managed to take hold and so there were no other available EFSs").

At some point, Sims sought to work with one particular EFS, Cynthia Weaver, but was denied that opportunity. At the time, he was told that Weaver declined to accept him as an additional EA because she had a full workload and was not taking on any new EA partners. *See* Plaintiff Ex. 5 (January 8, 2003 email from Plaintiff to Medlock stating that Weaver advised him "she will not accept any new agents to work with" and inquiring about the EFS selection process). Allstate continues to maintain that this choice by Weaver was the reason Sims was denied the opportunity to work with her. *See,* Uschelbec Dep. at 20 & 29. No contrary evidence has been presented.

During the period at issue, there were twenty to twenty-five EAs in Sims's region but only four EFSs. Medlock Dep. at 31; Lowe Dep. at 27. Allstate, at that point, had a policy to try to have

---

[2] With respect to this claim, the information Allstate received from the EFSs regarding why their relationships with Sims failed is what is critical, not whether those facts were correctly stated. In any case, no evidence has been offered to suggest the failures occurred for any other reason, most particularly one that might be attributable to Allstate.

one EFS for every five EAs in the region in which Sims worked. Uschelbec Dep. at 21. As noted above, Sims was ultimately unsuccessful in using the EFS program. Further, according to Allstate, Sims's overall lack of production caused Defendant to seek termination of Plaintiff's Agreement.

**Direct Access Program.** Allstate also had a "Direct Access Program" available in some portions of the country during the relevant time frame. Medlock Dep. at 26-27. Very little information has been provided regarding this program other than testimony by a defense witness that it was never made available to *any* agents in Sims's area (South Carolina). *Id.* Plaintiff has provided no evidence to the contrary.

**Computer Problems.** During a several day period beginning on June 8, 2004, Plaintiff experienced interruptions of his computer connection to Allstate. Sims Dep. at 229-31. Sims checked with other agents and learned that they were not experiencing similar problems.

A BellSouth technician who came to check on the problem advised Sims that "there was no problem with [the] BellSouth line or the MCI line, it was coming directly from suspicious activity from Allstate home office." Sims Dep. at 231. A work order completed by the technician, as read by Sims in his deposition, states

> BellSouth technician, Kenny Edwards, changed the SMJK out on suspicion, since MCI and BellSouth were failing to fit with QRRS yesterday. SMJK is changed out. IPEIGRP-2004-06-080151141. Add comment tested clean to the CSO multipatterns. BellSouth changed the SMJK on suspicious requested status by OTT.

Sims Dep. at 230. The problems apparently ceased after the work represented by this work order was completed.

Based on the BellSouth technician's comments and other EA's lack of similar computer problems, Sims concluded that the problems were "Allstate's way of getting back at me, shutting

down my computers." No explanation of the meaning of the terms used in the work order has been provided.[3] Neither has Sims directed the court to any direct evidence of the BellSouth technician's conclusions or his basis for those conclusions, other than the cryptic information contained in the work order.

**DISCUSSION**

I.     **Breach of Contract Claim**

Allstate argues that Sims has failed to establish a breach of contract, in part because Sims has failed to identify any specific provision of the Agreement or incorporated documents which has been breached. Allstate specifically argues that it had no obligation under the Agreement or EFS program to provide Sims with an in-house EFS.[4]

Sims responds by relying on Allstate's general duty to assist him in succeeding in meeting his goals which duty is evidenced by the contractual statement that Allstate was "committed to assisting [EAs] in being successful and in generating revenue to grow your business and meet your income goals." Sims further argues that Allstate breached its contractual duties by: (1) failing to offer Sims assistance under the Direct Access Program; (2) failing to provide Sims with an in-house EFS; (3) preventing Sims from working with Weaver; and (4) reassigning his last EFS. *See* Plaintiff's Memorandum in Opposition, Dkt No. 24 at 3-4.

---

[3] Questioning by counsel suggests that "SMJK" may be an abbreviation for "smart jack." Sims Dep. at 230. Presumably, if replacing this jack in Plaintiff's office solved the problem, then the problem, necessarily, did not originate on the Allstate end and could not, therefore, be a problem for which Allstate would be liable in negligence.

[4] The term "in-house" EFS refers to an EFS housed in the offices of the agent in question.

7

Sims has not directed the court to any contractual provision which requires Allstate to offer him participation in the Direct Access Program. Neither has he presented evidence which might contradict Allstate's claim (through Medlock's testimony) that the Direct Access Program was never offered to any agent in Sims's geographic area.

Sims has also failed to offer evidence challenging Allstate's explanation of why Sims failed to successfully partner with an EFS, including that Sims's multiple failures occurred because Sims failed to provide reciprocal support to those EFSs who did attempt to work with him. Sims has, likewise, failed to present any evidence that Weaver declined to work with him for some reason other than her full workload. Certainly no evidence has been presented that this or any other difficulty Sims experienced with the EA/EFS Partnership program is attributable to a breach of contract by Allstate.[5]

In summary, Sims has failed to offer evidence from which a reasonable jury could find that Allstate owed Sims any obligation either to provide him with an in-house EFS or to make any greater effort than it did in assisting Sims in finding an EFS partner or succeeding in meeting his goals as an agent. Allstate is, therefore, entitled to judgment on this claim.

## II.    Breach of Covenant of Good Faith and Fair Dealing

Plaintiff concedes that the covenant of good faith and fair dealing does not provide an independent basis for a claim. Dkt No. 24 at n. 1. He asserts, however, that the duty is relevant to

---

[5] In his deposition, Plaintiff took the position that anything less than providing him with an in-house EFS constituted a breach of contract. Sims Dep. at 35. He also alleged improper treatment because he was not given "the same opportunities as any other agent." Sims Dep. at 233. There is no document which would support the existence of a duty to provide an in-house EFS. Neither do any other facts support the implied premise that providing an in-house EFS was the norm as opposed to the rare exception. Indeed, the relative number of EFSs (4) to EAs (20-25) in Plaintiff's geographic area precludes such a conclusion.

construing the contract and determining if it has been breached. *Id.* (citing *Rotec Services, Inc. v. Encompass Services, Inc.*, 597 S.E.2d 882, 883-83 (S.C. App. 2004) (holding that the allegations of breach of duty of good faith and fair dealing are subsumed within the contract cause of action)). Accepting this statement as true does not, however, modify the result as to the breach of contract claim, because, even engrafting the existence of the duty of good faith and fair dealing onto the Agreement, Sims has failed to proffer evidence from which a jury could find that Allstate breached any contractual obligation expressed or implied in the Agreement.

### III. Breach of Fiduciary Duty

There is no evidence which could establish the existence of a fiduciary duty running from Allstate to its independent agent, Sims. *See generally O'Shea v. Lesser,* 416 S.E.2d 629, 631 (S.C. 1992) (holding that "[a] confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence"). Rather, the duties owed by Allstate to Sims are purely contractual in nature and, even in their advising and assisting role, do not give rise to fiduciary duties. *E.g., Hendricks v. Clemson University,* 578 S.E.2d 711 (S.C. 2003) (finding role as academic advisor does not create a fiduciary relationship and stating "[h]istorically, this Court has reserved imposition of fiduciary duties to legal or business settings, often in which one person entrusts money to another, such as with lawyers, brokers, corporate directors, and corporate promoters").

Sims has not directed the court to any other evidence which would support a finding that the contractual relationship between Allstate and Sims was converted into a fiduciary relationship (as

to the duties running from Allstate to Sims).[6]  Sims's claim for breach of fiduciary must therefore fail.

**IV. Negligence**

Sims's negligence claim rests on the allegation that Allstate both caused his computer difficulties and breached a duty of due care in doing so.  In support of these conclusions, Sims offers his own lay opinion that Allstate intentionally did something to interfere with his computer service. He conceded, however, that he did not know "if they were the ones trying to sabotage my computer system or [if] it came from some different source."   Sims Dep. at 233.  Sims also conceded that he did not understand the meaning of the terms in the work order which reflected the work done by the BellSouth technician.  Sims Dep. at 230.

This leaves Plaintiff with his own subjective conclusions as to the source of the problem. These conclusions were based on the non-specific hearsay statements of the BellSouth technician as to "suspicious activity.".[7]  Allowing the negligence claim to proceed under these circumstances

---

[6] The court recognizes that an agent may have fiduciary duties to his principal. *See generally Darby v. Furman Co., Inc.,* 513 S.E.2d 848 (S.C. 1999) (addressing fiduciary duty owed by real estate broker to seller of property).  Assuming without deciding that Sims might, in certain respects, owe such duties to Allstate would not, however, support the converse proposition that Allstate, as principal, owed a fiduciary duty to its agent.

[7] The statements of the BellSouth representative would themselves be hearsay and, therefore, excluded absent an applicable exception (and no exception is suggested or evident).  Fed. R. Evid. 801.  Only expert opinion testimony may be based on evidence which is not independently admissible. Fed. R. Evid. 702. Sims clearly does not qualify as an expert in the relevant field.  Thus, his testimony is lay opinion testimony which must meet various requirements including that it be "rationally based on the perception of the witness." Fed. R. Evid. 701. Because Sims's opinion is based on the statements of the BellSouth representative, it does not meet this requirement. *See Bandera v. City of Quincy,* 344 F.3d 47 (1st Cir. 2003) (witness's testimony as to her own assessment of plaintiff's experience was "wholly inappropriate opinion testimony," in part because it was not based on the witness's actual and direct knowledge of what happened to plaintiff).

would impermissibly allow Plaintiff to rely on mere conjecture and speculation. *See McQuillen v. Dobbs,* 204 S.E.2d 732 (S.C. 1974) (holding circumstantial evidence may support negligence claim only if it "would justify the inference that [plaintiff's] injuries were due to the negligent act of the defendant, and [would] not leave the question to mere conjecture or speculation"). Allstate is, therefore, entitled to judgment as a matter of law on this claim.

## CONCLUSION

Defendant's motion to dismiss is granted as to the second cause of action and its motion for summary judgment is granted as to the remaining causes of action. The Clerk of Court is directed to enter judgment for Defendant.

IT IS SO ORDERED.

    s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
April 5, 2006

C:\temp\notesB0AA3C\04-23259 sims v allstate sj order.wpd